No. 51,782

INTERNATIONAL PETROLEUM SERVICES, INC., *Appellee,* v. S & N
WELL SERVICE, INC., *Appellant.*

(639 P.2d 29)

Opinion filed January 15, 1982.

*Ervin E. Grant,* of Grant & Fillmore, of El Dorado, argued the cause and was on the brief for the appellant.

No appearance by appellee.

The opinion of the court was delivered by

FROMME, J.: International Petroleum Services, Inc., plaintiff, brought this action to recover for materials and repairs to three units of oil well servicing equipment. Two of these units had been sold previously by plaintiff to S & N Well Service, Inc., defendant herein. The third unit, which was repaired by plaintiff, was leased by defendant from another individual. Defendant filed an answer and a cross-petition. In the cross-petition defendant claimed breach of implied warranties arising from the sales of the equipment and asked for both ordinary and consequential damages. In addition, defendant sought disallowance of certain amounts claimed by plaintiff because plaintiff's charges were said to be unreasonable.

The case was tried to the court and judgment was entered on the petition in favor of plaintiff and against the defendant in the amount of $17,385.83. On defendant's cross-petition, defendant was given judgment against the plaintiff for $1,042.69. A judgment for the net amount of $16,343.14 was entered in favor of plaintiff and against the defendant. The defendant appealed and the Court of Appeals affirmed under Rule No. 7.042 (b) and (d) (228 Kan. lii, liii). The case is now before this court on an order granting defendant's Petition for Review.

There are two principal questions to be answered in this appeal. The first is whether the implied warranties mentioned in K.S.A. 84-2-314 and 84-2-315 apply to the sale of used goods. The second question is whether consequential damages resulting from a seller's breach of warranty are recoverable, and, if so, under what circumstances.

The uniform commercial code sections on implied warranties arising from the sale of goods cover merchantability, found in K.S.A. 84-2-314, and fitness for a particular purpose, found in K.S.A. 84-2-315. These sections are as follows:

"(1) Unless excluded or modified (section 84-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

"(2) Goods to be merchantable must be at least such as

"(a) pass without objection in the trade under the contract description; and

"(b) in the case of fungible goods, are of fair average quality within the description; and

"(c) are fit for the ordinary purposes for which such goods are used; and

"(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

"(e) are adequately contained, packaged, and labeled as the agreement may require; and

"(f) conform to the promises or affirmations of fact made on the container or label if any.

"(3) Unless excluded or modified (section 84-2-316) other implied warranties may arise from course of dealing or usage of trade." K.S.A. 84-2-314.

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." K.S.A. 84-2-315.

Considering the above provisions of 84-2-314 it would be inaccurate to say the code defines merchantability. What this statute does is set minimum standards of merchantability. The statutory language is that "[g]oods to be merchantable must be *at least* such as . . . ." Emphasis supplied. Thus more may be required by the parties' agreement, course of dealing, or usage of trade, but the minimum standards assure a buyer that if the goods received do not conform at least to normal commercial expectations, the buyer will have a cause of action by which he or she can secure compensation for losses suffered. Even though the seller may be careful not to make a single assertion of fact or promise about the goods, the ordinary buyer in a normal commercial transaction has a right to expect that the goods which are purchased will not turn out to be completely worthless. The purchaser cannot be expected to purchase goods offered by a merchant for sale and use and then find the goods are suitable only for the junk pile. On the other hand, a buyer who has purchased goods without obtaining an express warranty as to their quality and condition cannot reasonably expect that those goods will be the finest of all possible goods of that kind. Protection of the buyer under the uniform commercial code lies between these two extremes. If an item is used or is secondhand, surely less can be expected in the way of quality than if the item is purchased new. See Nordstrom, Law of Sales § 76, pp. 232-238 (1970); and White-Summers, Uniform Commercial Code § 9-6, pp. 343-355 (2d ed. 1980) for further discussion of this subject.

In addition, we note that for a sale to give rise to the implied warranty *of merchantability* the seller must be a merchant. K.S.A. 84-2-104 defines a merchant as follows:

"(1) 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." See also *Decatur Cooperative Association v. Urban,* 219 Kan. 171, Syl. ¶ 2, 547 P.2d 323 (1976).

All parties to this action agree that the plaintiff, International Petroleum Services, Inc., does manufacture and deal in well servicing equipment of the kind sold to defendant. We conclude that plaintiff was a merchant within the statutory definition when it sold the two units to the defendant.

In passing we note under K.S.A. 84-2-315, relating to the implied warranty of fitness for a particular purpose, there is no requirement that the seller be a merchant. However, the seller at the time of contracting must have reason to know the goods are being purchased for a particular purpose, and the seller must know further that the buyer is relying on the skill and judgment of the seller to select or furnish suitable goods. In such case an implied warranty that the goods shall be fit for such purpose may arise. Further discussion on the subject will follow later.

After examining the uniform commercial code—sales, we find no provision excluding the sale of used goods from the provisions of the code. K.S.A. 84-2-102 merely states that Article 2 on sales applies "to transactions in goods." K.S.A. 84-2-105(1) states:

" 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action."

The commentators generally have agreed that the implied warranties recognized by K.S.A. 84-2-314 and 84-2-315 apply to sales of both new and used goods. Note, *Sales: Extension of Implied Warranty of Merchantability to Used Goods,* 46 Mo. L. Rev. 249, 250 (1981); Stasney, *UCC Implied Warranty of Merchantability and Used Goods,* 26 Baylor L. Rev. 630, 637 (1974); Hunt, *Implied Warranties of Quality on Used Motor Vehicles in Texas,* 9 St. Mary's L. J. 308, 315 (1977); *Article Two Warranties in*

*Commercial Transactions,* 64 Cornell L. Rev. 30, 85 (1978). Texas seems to be the only state which has steadfastly refused to recognize implied warranties in the sale of used goods. The old adage "let the buyer beware" applies to the sale of used goods in Texas.

In *Atlas Industries, Inc. v. National Cash Register Co.,* 216 Kan. 213, 531 P.2d 41 (1975), this court recognized an implied warranty in the sale of a used accounting machine, without discussion as to applicability of these warranties to used goods. The parties in that case did not question whether the uniform commercial code—sales covered sales of used equipment.

We note the following statement which appears in the Comments following K.S.A. 84-2-314:

"3. A specific designation of goods by the buyer does not exclude the seller's obligation that they be fit for the general purposes appropriate to such goods. *A contract for the sale of secondhand goods, however, involves only such obligation as is appropriate to such goods for that is their contract description."* Comment 3. Emphasis supplied.

This comment by the drafters of the statute strongly indicates an intent to include sales of both new and used goods within the statutory provisions.

A few of the decisions from other states which have recognized an implied warranty of merchantability in the sale of used goods are: *Brown v. Hall,* 221 So. 2d 454, 457 (Fla. Dist. Ct. App. 1969); *Georgia Timberlands, Inc. v. Southern Airway Company,* 125 Ga. App. 404, 405, 188 S.E.2d 108 (1972); *Overland Bond and Inv. Corp. v. Howard,* 9 Ill. App. 3d 348, 352, 292 N.E.2d 168 (1972); *Tracy v. Vinton Motors, Inc.,* 130 Vt. 512, 515, 296 A.2d 269 (1972).

We hold that the implied warranties recognized in K.S.A. 84-2-314 and 84-2-315 may arise from sales of both new and used goods.

There may be situations in which these warranties will not arise. For example, a sale between two individuals who are not merchants within the statutory definition will not give rise to a warranty of merchantability. The sale in such case is not made *by a merchant* as required by K.S.A. 84-2-314. Another situation in which an implied warranty may not arise in the sale of used goods is when the warranty is disclaimed within the provisions of K.S.A. 84-2-316(3)(*a*), and goods are offered for sale "as is" or

"with all faults," thus calling the buyer's attention to the exclusion of warranties. However, certain requirements contained in this statute must be met before these limitations can be imposed. See also the requirements in the Consumer Protection Act, specifically K.S.A. 50-639(c) and (d).

It should be noted that the extent of the obligation of a merchant who sells used goods depends on the circumstances of the transaction. In the case of a sale by auction of used restaurant equipment it was held no implied warranty of merchantability attached. See *Regan Purchase & Sales v. Primavera,* 68 Misc. 2d 858, 860, 328 N.Y.S.2d 490 (1972), wherein it is stated:

"The specific question here is whether a breach of warranty is made out by evidence that used restaurant equipment bought at an auction did not function upon delivery, in the absence of any competent evidence establishing the character of the defect. The standard formulated in the Official Comment clearly requires careful attention to the realities of the individual transaction.

"What we are concerned with here are two pieces of restaurant equipment—a dishwasher and an ice-maker—undoubtedly larger and more complex than similar equipment intended for home use—both of which had undergone the heavy wear and tear normal in the operation of a restaurant. The possibility that individual components might be worn out or otherwise defective, requiring replacement or repair, is surely implicit in such a transaction.

"Where such pieces of equipment are purchased for continued commercial use at a significant discount from new equipment of the same kind, more is surely required to establish a breach of the warranty than the bare circumstance that they did not operate upon delivery."

Courts have recognized that any number of things can foul the operation of complex machinery, and in the case of used goods, not all of these problems amount to a breach of the warranty of merchantability. The buyer's knowledge that the goods are used, the extent of their prior use, and whether the goods are significantly discounted may help determine what standards of quality should apply to the transaction.

With the foregoing background we turn now to the specific facts of this case. S & N Well Service, Inc. began business in February, 1977. The president of the corporation, Mr. Smith, had been in this type of business since 1970 and had operated eleven oil well servicing rigs before he started the present company.

In February, 1977, Mr. Smith purchased from plaintiff one of the units now in question. It is referred to as a single drum Franks Unit. He was advised and understood the unit was used. The unit was equipped with a diesel engine, and plaintiff informed the

purchaser that the engine had been checked out and approved by Detroit Diesel, a company specializing in the sale and servicing of diesel engines. However, no express warranty was given on the unit and no disclaimer was mentioned or declared by the seller. This particular machine had been built by plaintiff from components of several other used oil well servicing rigs. These had been purchased previously by plaintiff and the components from those machines were assembled in plaintiff's shop to make up Unit No. 1. The working parts such as the draw works and engine were used. Only a few of the components such as the cab and fenders were new. Defendant was advised of these facts. We find nothing in the record as to the price paid for the secondhand unit as compared to the price of a new unit.

Problems developed with Unit No. 1 after it had been used only two days. The fourth gear kept slipping out. A rebuilt differential unit was installed by plaintiff. The oil line to the air compressor was not connected properly when sold and the motor threw a connecting rod. The unit was returned to plaintiff. A new connecting rod was installed and the oil line was properly connected. No charges were made for these repairs. Thereafter, the unit worked fine for 90 days, at which time the engine began to misfire and the heat gauge indicated overheating. Close examination disclosed a head gasket was blown. It was then discovered the engine head was cracked and the pistons were cupped out. In effect, the engine was worn out and needed to be completely rebuilt. The machine was returned to the plaintiff.

The engine was then pulled and rebuilt by Diesel Equipment Company of Wichita. For the rebuilding of the engine and the work in pulling and reinstalling the engine plaintiff submitted a bill on invoice No. 9945 for $6,765.01. After defendant complained of the amount of these charges, the bill was reduced to $4,932.27. The defendant was apparently satisfied with this adjustment for a time but did not make payment. Plaintiff sued for the reduced amount.

Now we turn to the second unit purchased from plaintiff in March, 1977. This will be referred to as Unit No. 2. It was a Cardwell K-200 double drum unit. Before purchasing the unit Mr. Smith, acting for the defendant company, asked that the rig be modified from a dual axle to a single axle unit. The single axle left on the machine was too light and within the first few days of

use the front axle bent. The rig was hauled in for repairs and the plaintiff company repaired the machine by exchanging the bent axle for a heavy duty axle. There was testimony by an officer of plaintiff company that they would have known the first single axle was too light if they had "ran the figures through right." In order to accommodate the new heavy axle, it was necessary to add larger rims and tires. The original invoice No. 9944 submitted for these charges totaled $3,982.07. The defendant company complained of the charges and again the bill was reduced, this time to $1,042.69 which equaled the cost of the rims and tires. Plaintiff sued for this amount. The trial court disallowed the amount finding there was a breach of warranty which required plaintiff as seller to make these repairs in order to return the value of the machine to the value it would have had at the time of sale if it had been as warranted.

As to Unit No. 1, the Franks Unit, the trial court considered the fact that this was a sale of used or secondhand goods. The unit was a highly complex machine known to be subject to heavy and sustained wear while in operation. It was made up of component parts of used machines of which neither party had knowledge concerning the extent of their use.

In Comment 7 appearing below K.S.A. 84-2-314, the authors of the UCC point out that in cases of doubt as to what quality is intended, the price at which a merchant closes a sale contract is an excellent index of the nature and scope of his obligation under the section. There was no evidence introduced in this case, however, as to the extent of the discount in the price of this used machinery. It is, therefore, nearly impossible to decide what standards of quality should apply to the transaction. We do know that the plaintiff merchant corrected the initial defects in the rig at its own expense. Plaintiff installed a rebuilt differential unit to repair the fourth gear, it connected the oil line to the air compressor, and it put in a new connecting rod in the engine. Thereafter, the unit worked fine for approximately 90 days before the diesel engine had to be rebuilt.

Under the facts and circumstances, we cannot say the trial court was in error in not allowing further damages for breach of the implied warranty of merchantability on Unit No. 1 (Franks Unit). The unit did operate satisfactorily for 90 days after the initial adjustments and repairs were made without charge. The machine

was fit for the ordinary purposes for which such goods are generally used, and even after the diesel engine wore out it still could be and was rebuilt. This oil well servicing equipment was then put back in service. By way of analogy we note that used automobiles generally carry no more than a thirty day guarantee. The plaintiff merchant in the present case made no untrue promises or affirmations as to the condition of this machinery. The trial court found that the plaintiff had the diesel engine checked over by Detroit Diesel and that company had approved the engine as being in working condition.

We now consider Unit No. 2, the Cardwell Unit. As previously pointed out, this machine when sold to defendant was a used or secondhand unit. At the request of defendant it was modified by plaintiff company from a dual axle to a single axle unit. Within the first few days after it was put in use, it became inoperable because of a bent single axle. There was testimony that the plaintiff-merchant knew or should have known the machine could not operate on this single axle. It was not strong enough to support the machine. It appears that the unit was not fit for the ordinary purposes for which the machine was to be used since it became inoperable in the first few days of use.

Using the guidelines previously discussed, we agree with the trial court that plaintiff breached an implied warranty when it sold this used oil well servicing unit in such a condition. It knew or should have known the single axle was not strong enough to accommodate the machine after it was changed from a dual axle to a single axle unit. Therefore, the trial court properly allowed defendant to recover the $1,042.69 required to make it operable.

The general measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. K.S.A. 84-2-714(2). As concerns used or secondhand goods it is generally understood that the measure of damages is the cost of repair when repair is possible. Sections 84-2-714 and 84-2-715 do not materially change remedies available in this state to an aggrieved party on breach of contract. *LaVilla Fair v. Lewis Carpet Mills, Inc.*, 219 Kan. 395, 405, 548 P.2d 825 (1976). See *Service Iron Foundry, Inc. v. M. A. Bell Co.*, 2 Kan. App. 2d 662, 678, 588 P.2d 463 (1978); and *Annot.*, 96 A.L.R.3d 299, §§ 13, 17.

In addition to the warranty of merchantability, defendant argues that in selling these two machines the plaintiff breached an implied warranty of fitness for a particular purpose as recognized in K.S.A. 84-2-315. In the official comments which appear following K.S.A. 84-2-315 it is pointed out:

"Purposes of Changes:

"1. Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting. Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists. The buyer, of course, must actually be relying on the seller.

"2. A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains."

The provisions of K.S.A. 84-2-315, covering the warranty of fitness for a *particular purpose,* are frequently confused with the implied warranty of merchantability which covers fitness for *ordinary purposes.* The warranty of fitness for a *particular purpose* is narrower, more specific, and more precise. See *Addis v. Bernardin, Inc.,* 226 Kan. 241, 245, 246, 597 P.2d 250 (1979); *Christopher & Son v. Kansas Paint & Color Co.,* 215 Kan. 185, 523 P.2d 709, *reh. denied* 215 Kan. 510 (1974); and *Boehm v. Fox,* 473 F.2d 445 (10th Cir. 1973).

In our present case the buyer's intended use of this equipment in his business was no different than the use of the equipment in any oil well servicing business. No specific use by the defendant buyer was envisaged which was peculiar to the nature of his business. When goods are acquired for the *ordinary purposes* for which such goods are generally used, no implied warranty of fitness for a *particular purpose* arises. A use for ordinary purposes falls within the concept of merchantability. So under the facts of the present case no implied warranty of fitness for a particular purpose arose.

The next issue concerns whether the defendant under his counterclaim was entitled to judgment for consequential damages

resulting from the seller's breach of an implied warranty of merchantability as to Unit No. 2. Defendant sought to recover for loss of profits during down time. This was on the Cardwell Unit which was changed from a dual to a single axle machine. We have previously determined there was no breach of warranty as to Unit No. 1.

K.S.A. 84-2-715 provides:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know *and which could not reasonably be prevented by cover or otherwise;* and

"(b) injury to person or property proximately resulting from any breach of warranty." Emphasis supplied.

Comments 2 and 4 which appear under the above section of the statute are applicable here. They read:

"2. Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach. The 'tacit agreement' test for the recovery of consequential damages is rejected. Although the older rule at common law which made the seller liable for all consequential damages of which he had 'reason to know' in advance is followed, the liberality of that *rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise. Subparagraph (2) carries forward the provisions of the prior uniform statutory provision as to consequential damages resulting from breach of warranty, but modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise.*

. . . .

"(4) The burden of proving the extent of loss incurred by way of consequential damage is on the buyer, but the section on liberal administration of remedies rejects any doctrine of certainty which requires almost mathematical precision in the proof of loss. Loss may be determined in any manner which is reasonable under the circumstances." Emphasis supplied.

In a proper case, in addition to ordinary damages for breach, any incidental and consequential damages under K.S.A. 84-2-715 may be recovered. K.S.A. 84-2-714(3). As for any damages for breach of warranty as to Unit No. 2, the trial court required the plaintiff to stand the entire cost of replacing the bent axle with the heavier axle and of equipping the machine with bigger rims and

tires. This restored the value of the unit to that value it would have had if the unit had been as warranted. This requirement of the trial court takes care of ordinary damages and leaves only the question of incidental and consequential damages for this court to determine. The defendant is claiming loss of profits from down time, that is for the time Unit No. 2 was inoperable because the axle was being repaired.

Under K.S.A. 84-2-715(2)(*a*) consequential damages have been construed generally to include loss of profits. See *LaVilla Fair v. Lewis Carpet Mills, Inc.,* 219 Kan. at 406, and cases cited therein. The trial court was in error in holding categorically that incidental and consequential damages could not be recovered. However, after an examination of the law and the evidence adduced in this case, we believe the trial court reached the right result for the wrong reason. A party claiming buyer's incidental and consequential damages not only has the burden of presenting evidence demonstrating the amount of these damages with reasonable certainty, but also has the duty to establish compliance with K.S.A. 84-2-715(2)(*a*) which requires proof of possible cover or mitigation. As to evidence of the amount of the loss the testimony as to down time on Unit No. 2 (Cardwell Unit) varied from three days to a week. We have no way of determining from the testimony how much down time actually was suffered. There was testimony to the effect it took three employees to operate the unit for a week. We do not know whether the $550.00 required to be paid by the defendant to the three employees covered a five or six day week. There was evidence that profits lost which were claimed by defendant were figured on a 40-hour week. Assuming an eight hour day and a five day week, lost profits under the evidence could vary from a low of $786.00 for three days to a high of $1,310.00 for five days.

Be that as it may, the defendant introduced no evidence to comply with the requirements for mitigation. In 96 A.L.R.3d 299 § 5[b], cases are collected which show that courts have differed as to who has the burden of proving that damages could or could not have been prevented as required by 84-2-715(2)(*a*). Kansas cases hold that mitigation is necessary. *Osborn v. Grego,* 226 Kan. 212, 217, 596 P.2d 1233 (1979); *Lines v. City of Topeka,* 223 Kan. 772, 781, 577 P.2d 42 (1978). In declaring what consequential damages may be recovered, K.S.A. 84-2-715(2)(*a*) refers to conse-

quential damages resulting from the seller's breach *which could not reasonably be prevented by cover or otherwise.* It seems to us that this places a duty of proving mitigation on the buyer. The buyer must attempt to minimize his damages in good faith as indicated in Comment 2 under K.S.A. 84-2-715 as previously quoted. From the record of this case, we do not know if machines used for servicing oil wells can be rented. Neither do we know whether any attempt was made by defendant to rent a unit for use while Unit No. 2 was being repaired. The statute excludes from consequential damages any loss which could reasonably have been prevented by cover or rental of another unit. It therefore follows that a buyer in proving consequential damages has the burden of proving a reasonable attempt on his or her part to prevent further loss by cover, *i.e.,* renting another machine. This the defendant failed to do, and no recovery of consequential damages can be had by defendant in this case. A similar rule has been declared in actions where damages are sought for loss of profits from the use of a motor vehicle. See *Peterson v. Bachar,* 193 Kan. 161, 166-67, 392 P.2d 853 (1964).

The final issue raised by defendant concerns the amount of plaintiff's charges for repairs and alterations to Unit No. 3 which unit was owned by a third person and leased to defendant. No breach of implied warranties are involved. Invoice No. 9885 was issued for repairs on Unit No. 3 (Cooper Draw Works). This was in an original amount of $9,553.75. Credit was allowed by plaintiff of $3,017.90, leaving a balance of $6,535.85. The latter amount was included in the judgment entered by the district court and approved by the Court of Appeals.

When a verdict is attacked for insufficiency of the evidence, the duty of the appellate court extends only to a search of the record for the purpose of determining whether there is any competent substantial evidence to support the findings. *Marcotte Realty & Auction, Inc. v. Schumacher,* 229 Kan. 252, Syl. ¶ 1, 624 P.2d 420 (1981). An appellate court should not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must examine the evidence in the light most favorable to the party prevailing below.

Contrary to appellant's contentions, the repair work requested on Unit No. 3 was complex. The parties understood it was hand work of a type that would be expensive. Questions about the

number of hours worked were disputed but after confrontation and discussion the parties seemed to agree and reduced the original bill from $9,553.75 to $6,535.85. Items included in the invoices were scrutinized by both parties. There was testimony that all parts listed were actually used on the rig. In addition to those specific amounts discussed in this opinion concerning Units 1, 2, and 3, there were approximately 29 additional invoices covering additional purchases of tools, equipment and repairs about which there was no dispute except for the reasonableness of the charges. These appear to be based on ordinary and reasonable charges. There was sufficient evidence to sustain the judgment in the amount determined by the district court.

The judgment of the trial court affirmed by the Court of Appeals is affirmed by this court.