2008-NMSC-054

192 P.3d 1205

**Sandra SALAZAR, Plaintiff–
Counterdefendant–
Petitioner,**

v.

**D.W.B.H., INC. d/b/a Santa Fe Mit-
subishi, Defendant–Counter-
claimant–Respondent.**

No. 30,571.

Supreme Court of New Mexico.

Aug. 26, 2008.

Rehearing Denied Sept. 19, 2008.

The Ross Firm, L.L.C., Gregory S.H. Ross, Donna J. Lynch, Santa Fe, NM, for Petitioner.

Keleher & McLeod, P.A., Richard B. Cole, Lynn E. Mostoller, Albuquerque, NM, for Respondent.

## OPINION

CHÁVEZ, Chief Justice.

{1} Defendant D.W.B.H., Inc., d/b/a Santa Fe Mitsubishi (Mitsubishi), installed a used engine in Plaintiff Sandra Salazar's car. Salazar sued Mitsubishi, alleging that the used engine smoked and lost oil from the moment the car was retrieved from Mitsubishi until it ultimately ceased to work approximately three months after its installation. Following a bench trial, the trial court found that Mitsubishi had breached express and implied warranties and violated the Unfair Practices Act (UPA), NMSA 1978, §§ 57–12–1 to –22 (1967, as amended through 1999), and awarded Salazar compensatory damages, punitive damages, and attorney fees, but denied to award her damages for the loss of use of her vehicle. Mitsubishi appealed this adverse judgment to the Court of Appeals, which reversed the trial court. We granted certiorari and conclude that there is substantial evidence to support the trial court's award of compensatory damages under the theories of breach of the implied warranty of merchantability and violation of the UPA. We therefore reverse the Court of Appeals and remand for its consideration of the issues concerning punitive damages, attorney's fees, and loss of use damages.

## I. BACKGROUND

{2} Salazar sought Mitsubishi's services after having engine problems with her 1993 Mitsubishi Eclipse. A Mitsubishi employee informed Salazar that her car's engine needed to be replaced. Salazar initially wanted her car's engine to be replaced with a new engine, but after speaking with a Mitsubishi employee about the cost of a new engine, she opted to have a used engine installed instead. She left her car with Mitsubishi in December 2000. Mitsubishi installed a used replacement engine that it purchased from Coronado Auto Recyclers (Coronado). Unbeknownst to Salazar, Coronado provided a 90-day warranty on the used engine.

{3} Salazar picked up her car from Mitsubishi in April 2001. She testified that the car was smoking when she drove it home from Mitsubishi and that two days later, after the car's oil light went on, a service attendant at a gas station checked the oil and found that the car was completely out of oil. A few days later, Salazar took the car back to Mitsubishi. Mitsubishi was unable to find a problem with the engine, so it sent the car to Coronado for further troubleshooting. Coronado was also unable to find anything wrong with the engine.

{4} Salazar retrieved her car from Coronado and drove it until mid-July. She testified that during this time, the car continued to smoke and lose oil rapidly. After the engine completely stopped working, it was towed to Mitsubishi, and Mitsubishi advised Salazar that the engine needed to be replaced. Salazar asked Mitsubishi to replace the engine based on her belief that Mitsubishi had warranted the engine. At this point, the 90-day warranty that Coronado provided on the engine had expired. According to Salazar, Mitsubishi informed her that, while their labor was warranted, they did not provide a warranty on the engine itself, and thus Salazar would have to pay for another replacement engine.

{5} Salazar then filed suit against Mitsubishi alleging violations of the UPA, breach of express and implied warranty, negligence, fraud,[1] and breach of contract. After a two-day bench trial, the trial court found in Salazar's favor on each count and awarded her compensatory damages, punitive damages, and attorney's fees. The trial court did not, however, award Salazar damages for the loss of use of her vehicle. Mitsubishi appealed the trial court's judgment, and Salazar cross-appealed the trial court's denial of loss of use damages. The Court of Appeals filed an unpublished opinion reversing the trial court because it concluded that the evidence was insufficient to support the trial court's judgment. *Salazar v. D.W.B.H., Inc.*, No. 25,928, slip op. at 20 (N.M. Ct.App. June 29, 2007).

{6} On review, we will uphold the trial court's judgment if it is supported by substantial evidence. *Chavarria v. Fleetwood Retail Corp.*, 2006–NMSC–046, ¶¶ 12, 17, 140 N.M. 478, 143 P.3d 717. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). Under this standard, we resolve all factual disputes and indulge all reasonable inferences in favor of Salazar, who prevailed in the trial court. *See Coates v. Wal–Mart Stores, Inc.*, 1999–NMSC–013, ¶ 46, 127 N.M. 47, 976 P.2d 999.

{7} Under this standard, we conclude that there is substantial evidence to support the trial court's compensatory damage award under the theories of breach of the implied warranty of merchantability and violation of the UPA. Salazar's compensatory damages award can be reinstated under either of these two theories, and thus we need not address Salazar's other theories of recovery. We address breach of warranty and violation of the UPA in turn.

## II. DISCUSSION

### A. BREACH OF EXPRESS WARRANTY

{8} Under the Uniform Commercial Code (UCC), NMSA 1978, §§ 55–1–101 through 55–2A–532 (1961, as amended through 2005), an express warranty can be created in one of

---

1. Salazar did not brief the issue of the sufficiency of the evidence to support her claim for fraud pursuant to Rule 12–213(A)(4) NMRA. Therefore, we do not address this issue.

three ways: (1) "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain," (2) "any description of the goods which is made part of the basis of the bargain," or (3) "any sample or model which is made part of the basis of the bargain." Section 55–2–313(1)(a)–(c). Common to all three types of express warranty is the requirement that an express warranty must be made as part of the basis of the bargain. This does not mean, however, that an express warranty must be specifically bargained for or even included as part of a written contract. 18 Richard A. Lord, *Williston on Contracts* § 52:45, at 260–61 (4th ed.2001). The UCC specifically provides that use of formal words such as "warrant" or "guarantee" are not necessary for the creation of an express warranty. Section 55–2–313(2). Nor is it necessary for the seller to have the specific intention to make an express warranty. *Id.* While the law does not require such specificity and formality in creating an express warranty, the fact still remains that at the very least, an express warranty must be made as part of the basis of the bargain.

{9} In this case, the record discloses very little evidence that would support a finding that the used engine was expressly warranted by Mitsubishi. There is no evidence of any description of the used engine that was made part of the basis of the bargain, nor is there any evidence that Mitsubishi provided a sample or model engine from which an express warranty could be created. Rather, at issue is whether Mitsubishi made a statement of fact or promise to Salazar relating to the engine that became part of the basis of the bargain. Salazar argues that there is a "mass of evidence" relating to the existence of such a warranty. However, none of the evidence to which Salazar points is sufficient to show that the used engine was expressly warranted by Mitsubishi. Part of the evidence on which Salazar relies relates to the existence of a warranty on labor provided by Mitsubishi and the 90–day warranty on the engine provided by Coronado. Neither of these warranties are at issue in this case. At issue is whether Mitsubishi expressly warranted the used engine it installed in Sala-

zar's car. Other evidence relied on by Salazar is testimony by a Mitsubishi employee regarding a 12–month warranty on parts and labor. However, Salazar only cites to a portion of the employee's testimony and fails to point out that the employee later clarified that the 12–month warranty on parts and labor is offered by Mitsubishi on the purchase of new engines, not used engines.

{10} Finally, Salazar contends that Mitsubishi's President, James Bewley, admitted that there was an express warranty at trial. Specifically, Bewley testified that "[t]here was never an issue of is it in warranty or not. We tried to fix the car until it came in, and the second engine was destroyed." This statement is taken out of context. Bewley did not admit that Mitsubishi expressly warranted the engine. Rather, in this portion of his testimony, Bewley emphasized Mitsubishi's attempts to diagnose the problem with the used engine it installed in Salazar's car. Only in isolation can Bewley's statement be interpreted as an admission of the existence of an express warranty.

{11} Part of our task in resolving factual disputes is to indulge all *reasonable* inferences in favor of Salazar. However, drawing inferences from statements that have been taken out of context would be unreasonable. *See Payne v. Tuozzoli*, 80 N.M. 214, 218, 453 P.2d 384, 388 (Ct.App.1969) ("In resolving conflicts in the evidence in support of the findings, it is not contemplated, nor is it consistent with reason, that words, phrases, clauses or sentences may be selected out of context and then combined to give support for a conclusion which is not supportable by the entire text of the testimony of the witnesses on the particular subject or subjects from which the selections are taken.").

{12} Despite Salazar's claim of a "mass of evidence" relating to this issue, there is really only one statement in the record worthy of review. Salazar and a Mitsubishi employee both testified that when Salazar came to pick up her car after the used engine had been installed, the Mitsubishi employee told Salazar that if she had any problems, to bring the car back in. This statement, however, does not constitute an

express warranty on the used engine. We realize that a statement made after the engine had already been installed can create an express warranty. The official comment to the UCC states that "[t]he precise time when words of description or affirmation are made ... is not material. The sole question is whether the language ... [is] fairly to be regarded as part of the contract." Section 55–2–313 cmt. 7.

{13} After reviewing the record, we do not find evidence that would indicate that the employee's statement was made as part of the basis of the bargain. The employee testified that he made the statement as part of "[g]ood customer service." Salazar testified that she believed that the statement constituted a warranty. The testimony that Salazar believed the statement to be a warranty is not enough to conclude that the statement was an express warranty. Finding no other evidence that would support such a conclusion, we find that the trial court's determination that the used engine was expressly warranted is not supported by substantial evidence. The breach of warranty review, however, does not end here.

## B. BREACH OF IMPLIED WARRANTY

{14} Unlike express warranties, implied warranties are not bargained for; they are imposed by law. *Int'l Paper Co. v. Farrar*, 102 N.M. 739, 742, 700 P.2d 642, 645 (1985). Under the UCC, "[u]nless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale." Section 55–2–314(1) (citation omitted). The trial court found that "[Mitsubishi] did not provide [Salazar] with a written statement of warranty or statement that there was no warranty." In so finding, the trial court concluded that "[p]ursuant to 55–2–313 NMSA, the engine and installation [Salazar] purchased was warranted. Pursuant to 55–2–316 NMSA, [Mitsubishi] did not limit or exclude warranty. [Mitsubishi] breached the implied warranty of fitness.... Such breach caused [Salazar] damages."[2] The Court of Appeals disagreed and held that

Mitsubishi effectively excluded the implied warranty of merchantability by including an "Exclusion of Warranties" provision, which is typed in extremely small print in a document Salazar allegedly signed when she picked up her car from Mitsubishi. *Salazar*, No. 25,928, slip op. at 17. The "Exclusion of Warranties" provision reads

> [a]ny warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer include, but are not limited to, any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

For such a written exclusion to be effective, the UCC provides that it must mention merchantability and it must be conspicuous. Section 55–2–316(2). While the exclusion mentions merchantability, whether it is conspicuous requires further analysis. Such a determination is for the court to make, and is thus subject to de novo review. *See* § 55–1–201(b)(10).

{15} The UCC defines conspicuous as "so written, displayed or presented that a reasonable person against whom it is to operate ought to have noticed it." Section 55–1–201(b)(10). For example, a heading in all capital letters "equal to or greater in size than the surrounding text" is considered to be conspicuous. Section 55–1–201(b)(10)(A). A provision that is "set off from surrounding text of the same size by symbols or other marks that call attention to the language" is also considered conspicuous. Section 55–1–

---

2. Although the trial court refers to the "implied warranty of fitness," the only implied warranty at issue in this case is the implied warranty of merchantability, and thus we view the trial court's reference to the implied warranty of fitness as an oversight.

201(b)(10)(B). The Court of Appeals relied on these two examples in determining that, as a matter of law, Mitsubishi's exclusion provision was conspicuous and thus constituted a valid exclusion of warranties. *Salazar,* No. 25,928, slip op. at 18–19. The provision is set off to one side of the page with the heading "Exclusion of Warranties" in all capital letters. The heading's capital letters are greater in size than the provision's extremely small lettering, but they are smaller than other capitalized words on the page. Indeed, the heading is smaller than the word "Signed," which follows the provision and calls for Salazar's signature, noting her agreement that warranties are excluded. As discussed below, Salazar did not sign her acknowledgment of this provision, and therefore did not agree that the warranties could be excluded.

{16} Although we do not conclude as a matter of law that the "Exclusion of Warranties" on this document is conspicuous, even if it was conspicuous, the exclusion is without force. The exclusion provision explicitly calls for an affirmative act; it requires that the customer agree to the exclusion of warranties. The exclusion provision states that "[t]he *undersigned* purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability." (Emphasis added.) Directly under the provision are lines for date and signature. Both lines are blank. A signature does appear on another portion of the document that specifically authorizes repairs.[3] However, while Salazar may have signed the document to authorize repairs, she did not sign agreeing to exclude warranties from the transaction.

{17} This conclusion is consistent with the policy underlying the UCC. In requiring an exclusion of warranties to be conspicuous, the UCC "seeks to protect a buyer from unexpected and unbargained language of disclaimer." Section 55–2–316 cmt. 1; *see*

*also C.E. Alexander & Sons, Inc. v. DEC Int'l, Inc.,* 112 N.M. 89, 95, 811 P.2d 899, 905 (1991) ("[o]ne purpose of the requirement that the disclaimer be ... conspicuous is to insure that the disclaimer of implied warranties is bargained for and forms part of the agreement."). In essence, because implied warranties are imposed by law, "[a] buyer is entitled to rely on the fact that he [or she] has warranty protection, unless the seller ... make[s] it brutally clear that such is not the case." 1 William D. Hawkland, *Uniform Commercial Code Series* § 2–316:3, at 2–711 (2002). To make a written exclusion provision clear to a buyer, a seller must employ the correct language and must also communicate it "in such a way that [its] meaning is driven home." *Id.* at 2–723; *see also* § 55–2–316(2) (requiring a written exclusion to mention merchantability and to be conspicuous). Thus, when reviewing exclusion provisions, we must look both to the provision's form and its language. In this case, we cannot ignore the specific language in the provision that requires a buyer's agreement in order to exclude warranties.

{18} In requiring such an affirmative agreement, a seller ensures that a buyer is not taken by surprise. We realize that actual consent is not mandated by the UCC in this area. The requirements and examples provided in the UCC, however, set the minimum criteria to protect buyers. Sellers are free to supplement the standards established in the UCC, and in doing so, make certain that buyers are aware of an exclusion of warranties. *See* § 55–2–316. We will uphold such efforts, especially since "[d]isclaimers of implied warranties are not favored and are strictly construed against the sellers for reasons of public policy." 3A Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code,* § 2–316:34, at 149 (3d ed.2002) (internal quotation marks and quoted authority omitted).

{19} In this case, without an effective exclusion, the implied warranty of merchantability remained intact. Therefore, the used

---

3. In her brief in chief, Salazar claims that the signature on this document is a forgery. At trial, however, Salazar admitted that she signed the document. The trial court found that one of the documents presented at trial that contained Sala-

zar's signature was forged. However, it is unclear exactly which document the trial court was referring to. Despite the confusion, whether or not the signature on the document in question is a forgery is not dispositive of this issue.

engine was guaranteed to be merchantable. Under the UCC, for goods to be merchantable, they must at least be "fit for the ordinary purposes for which such goods are used." Section 55–2–314(2)(c). In addressing used goods, the official comment to the UCC provides that

> [a] specific designation of goods by the buyer does not exclude the seller's obligation that they be fit for the general purposes appropriate to such goods. A contract for the sale of second-hand goods, however, involves only such obligation as is appropriate to such goods for that is their contract description.

*Id.* cmt. 3. The Supreme Court of Kansas, in describing the merchantability standard, stated that

> the ordinary buyer in a normal commercial transaction has a right to expect that the goods . . . will not turn out to be completely worthless. The purchaser cannot be expected to purchase goods offered by a merchant for sale and use and then find the goods are suitable only for the junk pile. On the other hand, a buyer who has purchased goods without obtaining an express warranty as to their quality and condition cannot reasonably expect that those goods will be the finest of all possible goods of that kind. Protection of the buyer under the uniform commercial code lies between these two extremes. If an item is used or is second hand, surely less can be expected in the way of quality than if the item is purchased new.

*Int'l Petroleum Servs., Inc. v. S & N Well Serv., Inc.,* 230 Kan. 452, 639 P.2d 29, 32–33 (1982). Accordingly, the implied warranty of merchantability, as applied to a used engine, does not guarantee that the engine will operate as would a brand-new engine. Nonetheless, the used engine at the very least must be fit for its ordinary purpose.

■ {20} After reviewing the evidence, we conclude that there is sufficient evidence to support a finding that the used engine did not operate properly when Mitsubishi delivered the car to Salazar, and thus that Mitsubishi breached the implied warranty of merchantability. Salazar's mother testified that she accompanied Salazar to get her car from Mitsubishi after the used engine had been installed and the car was "smoking a lot" at that time. Salazar testified that the car's oil light went on two days after she picked up her car, which prompted her to take it to a nearby gas station. The attendant at the gas station testified that the car was completely out of oil. Thereafter, Salazar testified that she had to add a quart of oil to the car every two to three days. Other witnesses also testified that they observed the car smoking soon after Salazar picked it up from Mitsubishi and that the car was losing oil.

■ {21} From these facts, the trial court could reasonably infer that the used engine did not function properly from the moment Salazar retrieved her car from Mitsubishi. When a used engine smokes and continuously loses oil immediately after its installation, the trial court could find that there was a breach of the implied warranty of merchantability. In its brief, Mitsubishi implied that Salazar needed to present more proof in this area and that there needed to be evidence "tying the smoke or the car's use of oil to a problem with the engine." However, to establish a breach of the implied warranty, a buyer is not required to prove a *specific* defect in the goods. *Oggi Trattoria & Caffe, Ltd. v. Isuzu Motors Am., Inc.,* 372 Ill. App.3d 354, 310 Ill.Dec. 10, 865 N.E.2d 334, 341 (2007). Rather, a buyer can use circumstantial evidence to show that the goods were not fit for the ordinary purpose for which they were intended. *Id.; Meldco, Inc. v. Hollytex Carpet Mills, Inc.,* 118 Idaho 265, 796 P.2d 142, 146 (Ct.App.1990); *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 444 (Tex.1989).

{22} New Mexico case law has implicitly recognized these principles. For example, in *Arnold v. Ford Motor Co.,* we held that there was substantial evidence to support the trial court's determination that an expressly warranted vehicle was defective despite the trial court's failure to make a specific finding of a defect and despite the fact that expert testimony was not presented at trial. 90 N.M. 549, 550–51, 566 P.2d 98, 99–100 (1977). We found it sufficient that the trial court based its finding of a defect on evidence that the vehicle's engine would cease to operate dur-

ing normal driving functions, would overheat when the air conditioner was in use, and would exhaust black smoke. *Id.*

{23} In light of these principles, Salazar was not required to prove the existence of a specific defect in the used engine. Rather, it was incumbent on Salazar to show only that the used engine was not fit for its ordinary purpose. While this may be proven with evidence of a specific defect, it can also be proven by circumstantial evidence. In this case, the trial court found the circumstantial evidence sufficient to find a breach of the implied warranty of merchantability, and the record supports such a finding.

## C. UPA VIOLATION

{24} The UPA makes it unlawful, in the conduct of any trade or commerce, to engage in unfair or deceptive trade practices and unconscionable trade practices. Section 57–12–3. An unfair or deceptive trade practice is defined in the UPA as

> any false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by any person in the regular course of his [or her] trade or commerce, which may, tends to or does deceive or mislead any person.

Section 57–12–2(D). In addition, the UPA empowers the attorney general "to issue and file as required by law all regulations necessary to implement and enforce any provision of the Unfair Practices Act." Section 57–12–13. Pursuant to this power, the attorney general has implemented regulations, in part, "to deter unfair business practices within the automotive industry." 12.2.6.6 NMAC. These regulations provide that

> [i]t is an unfair or deceptive trade practice for an automotive repair shop to fail to post the major provisions of its warranty policy in a prominent and conspicuous location within the repair facility and to fail to provide any person who has purchased automotive repair services with a written

warranty or statement that there is no warranty, if such is the case.

12.2.6.9(A) NMAC.

{25} A violation of the regulations is a violation of the UPA. 12.2.6.15 NMAC. The regulations, however, are not "exhaustive," but rather provide "basic rules." 12.2.6.8(C) NMAC. As such, "it is not intended that literal compliance with [the] regulations be an absolute protection against liability for practices and procedures surrounding automotive repair." *Id.* Therefore, in reviewing compliance with the regulations, we are to take "all relevant circumstances into account," and if "the purpose of the ... requirement in the regulation is met, regardless of whether or not the technical requirements of the regulations are met," then a party can be found to be in "substantial compliance." 12.2.6.13 NMAC.

{26} In this case, the trial court found that Mitsubishi failed to provide Salazar with a statement of warranty, and thus violated the regulations. The record supports such a finding. At trial, there was testimony indicating that Mitsubishi warranted their labor, and it is undisputed that Coronado provided a 90–day warranty on the used engine. Yet, Salazar testified that Mitsubishi never provided her with a written statement explaining this warranty information.

{27} The closest evidence indicating that Salazar received any warranty information in writing is the document that contained the "Exclusion of Warranties" provision. However, as previously discussed, this document did not effectively disclaim any warranties. In addition, the document addresses neither the alleged warranty on labor provided by Mitsubishi nor the 90–day warranty on the engine provided by Coronado. As previously discussed, there is also some confusion regarding whether Salazar signed the document in question at all. If Salazar did not sign the document, an inference can be made that she never received it. If this is the case, there is no evidence that Mitsubishi provided her with any warranty information. If, on the other hand, Salazar did receive the document, the only warranty information she was provided was an ineffective disclaimer of

warranty. In either case, Mitsubishi failed to provide Salazar with appropriate warranty information. In failing to do so, Mitsubishi violated the attorney general's regulations and, in turn, violated the UPA.

## III. CONCLUSION

{28} The trial court's award of compensatory damages is supported by both breach of the implied warranty of merchantability and violation of the UPA. We therefore reverse the Court of Appeals and reinstate Salazar's compensatory damage award of $2,926.45 plus pre-judgment interest. We also remand the case to the Court of Appeals to consider the issues it did not reach, including punitive damages, attorney's fees, and loss of use damages.

{29} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, PETRA JIMENEZ MAES, RICHARD C. BOSSON, and CHARLES W. DANIELS, Justices.