IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMCA-088

Filing Date: July 9, 2012

Docket Nos. 30,775 & 30,804

LOWELL RICHARD DYDEK,

      Petitioner,

MARY OLENE DYDEK,

      Respondent.

and

JOSEPH E. GANT, III., in his capacity as Receiver,

      Intervening Plaintiff-Appellant/Cross Appellee,

USAA CASUALTY INSURANCE COMPANY,

      Defendant-Appellee/Cross-Appellant.

and

LOWELL R. DYDEK, and MARY O. DYDEK,

      Defendants.

APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY
Freddie J. Romero, District Judge

The McClenahan Law Firm, PLLC
Barry A. McClenahan
San Antonio, Tx

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Jocelyn Drennan
Albuquerque, NM

1

for Appellee

Michael B. Browde
Albuquerque, NM

Randy K. Clark, P.C.
Randy K. Clark
Roswell, NM

for Appellant

**OPINION**

**BUSTAMANTE, Judge.**

**{1}**     This is an insurance bad faith action brought by Joseph Gant (Receiver) on behalf of Lowell Dydek (Husband).  Following a bench trial, the district court ruled that "USAA breached its contract with [Husband] by failing to act in good faith to make a timely policy limits settlement offer to Mary Dydek [Wife] and causing a Judgment in the amount of 2.8 million dollars to be entered against [Husband]."  The district court concluded that "USAA knowingly failed to in good faith effectuate a prompt, fair, and equitable settlement of [Wife's] liability claim . . . in violation of [NMSA 1978, Sections] 59A-16-20 and 59A-16-30."  Although Receiver prevailed, the district court ruled that Wife's agreement not to execute the judgment against Husband's personal assets precluded the award of the excess judgment as damages.  Instead, the court awarded $100 as nominal damages.

**{2}**     The district court also concluded "that USAA wantonly and recklessly breached its contract with [Husband], and violated [Sections] 59A-16-20 and [-30]." As a consequence of this ruling, the district court granted Receiver attorney fees and costs incurred in pursuing the bad faith claim against USAA as well as punitive damages in the amount of $300,000. In addition, the district court awarded Receiver "compensatory damages for attorney[] fees and costs expended in the Texas litigation."  The district court's ruling that USAA acted recklessly and wantonly was based in part on its conclusion that "USAA's actions . . . in the Texas litigation show the culpable conduct of USAA regarding [Husband]."

**{3}**     Receiver appeals the district court's refusal to award the full amount of the excess liability judgment entered against Husband.  We reverse that portion of the district court's judgment. USAA cross-appeals arguing that (1) the district court erred in finding that USAA acted in bad faith; and (2) Receiver was not properly appointed and, therefore, the bad faith claim was not prosecuted by the real party in interest. We affirm the district court as to all matters raised in the cross-appeal.

## I.     BACKGROUND

2

**{4}**     The factual background undergirding the district court's decision is detailed in its comprehensive "Decision, Findings of Fact, Conclusions of Law, and Order."  The parties do not challenge the facts as found by the district court—USAA agrees that they are "largely based on undisputed evidence"—and we therefore accept them as accurate and controlling. The background facts organize themselves rather neatly into three areas: (1) the three-month period following the collision and ending with Wife's filing of her tort action against Husband in October 2003, (2) the facts surrounding the so-called "Texas litigation" starting in April 2005, and (3) the process leading to the appointment of Receiver.  We will provide a synopsis of the post-collision events and the Texas litigation here because they both have a direct impact on the finding of bad faith—which we will examine first.  We will provide a summary of the facts regarding the Receiver's appointment as part of our analysis of that issue.

## A.      Collision and Claims Handling

**{5}**     On July 21, 2003, Husband was driving a vehicle in which Wife was a passenger. The couple was headed to a neurologist appointment to assess what was later determined to be Husband's early onset of Alzheimer's disease.  Husband attempted to pass on a blind curve and collided head-on with another vehicle.  Wife was severely injured and within weeks of the collision incurred hundreds of thousands of dollars in medical bills. **[RP 2395, 2421 FOF 25; Def. Exh. #17]**  Wife's injuries included:  (1) complex facial fractures, (2) a fractured jaw, (3) facial lacerations, (4) acute respiratory failure requiring a tracheotomy, (5) bilateral rib fractures, (6) fractured wrist, (7) fractured spine, (8) bladder rupture, (9) fractured pelvis, (10) fractured and lacerated knees and knee ligament displacement, (11) fractured/dislocated right ankle, (12) fractured left leg, and (13) a puncture wound to the right foot.  As of July 25, 2003, Wife was in intensive care, had undergone "an open reduction of internal fixation [ORIF] surgery on her legs and was scheduled for spinal/back surgery."  USAA admitted during discovery that by July 25, it was aware of Wife's general condition and impending surgery.  Though the record does not reflect exactly when Wife was discharged from the hospital, it is clear that she went home sometime in late August with severe injuries after multiple surgical interventions and medical bills in excess of $300,000.

**{6}**     USAA confirmed Husband's coverage and opened a claim file on July 23, 2003. From that point on each of USAA's claim handling activities "were reviewed by management, ratified and found to be satisfactory to USAA and constituted a general business practice of USAA."

**{7}**     On July 25, USAA determined that Husband was "100% at fault for the collision and crash injuries" to Wife.  USAA had enough knowledge of the type and extent of the injuries Wife had incurred to classify her injuries and make a "Serious Injury Referral" to the home office.  By July 25, USAA knew where Wife was hospitalized and her general condition, knew the identity of the financial case manager for the hospital, and had received a call from the hospital providing updated billing information for Wife's treatment.

3

**{8}** Taylor Stott was the bodily injury adjuster assigned to the file. Stott knew as soon as he reviewed the file on July 25 that Wife's "injuries and claim had a value in excess of the amount of [Husband's] liability coverage." On July 25, USAA set a reserve for Wife's bodily injury claim at the policy limit of $100,000. Soon after, however, USAA reduced the reserve to $25,000, relying on a provision in its policy that limited coverage for family members to $25,000. USAA relied on this provision "to justify its initial delay in paying [Wife's] liability insurance benefits." USAA was aware at the time it reduced the reserve that the family coverage limit had been declared invalid in New Mexico for at least eighteen years. USAA had a provision in its internal operating procedures that said the family coverage limit was invalid in New Mexico.

**{9}** Eventually, Wife began discussions with USAA to obtain insurance proceeds to help defray her medical costs. Though USAA knew within days that Husband was entirely at fault and that Wife's damages would exceed the $100,000 policy limit—and after paying the $5000 limit for medical expenses—it made no settlement offers or payments to Wife until October 22, 2003. Instead, on August 20, USAA instructed Wife to forward any additional charges to her health insurer. Similarly, on August 27, USAA sent Wife copies of letters it had sent to various of her medical care providers refusing to pay them on their claims and referring them to Wife's "health carrier."

**{10}** On September 12, Wife started to correspond with USAA by faxed letter. Each of the letters she sent contained a variation of the same theme, including a recitation of severe injuries, the amount of the medical bills to date, attached copies of medical bills, requests for information, and requests for payment. USAA's file did not reflect any written response to these communications prior to September 26. On September 22, Wife faxed a letter demanding payment of the policy limits by September 28 at noon. Attached to the letter were medical bills totaling over $348,000. The letter, which USAA received on September 23, 2003, indicated that Wife would no longer be willing to settle for the limits after September 28, 2003. Despite the deadline, USAA initially ignored the letter. The letter was received by the medical claims adjuster for USAA on September 23. Wife had been in contact with her previously. The adjuster promptly reviewed the offer and "recognized the time feature of the letter." The adjuster's "usual business practice was to deliver such letters immediately to Taylor Stott, the bodily injury claims adjuster handling [Wife's] claims." On September 26, after a conversation with Stott, Wife faxed an additional copy of her timed demand and request for payment of policy limits to USAA. USAA did not acknowledge receipt of Wife's timed settlement demand, did not respond to the settlement demand and allowed it to expire. As of September 17, USAA had been informed that Wife was "now represented."

**{11}** The first entry in USAA's running computer file reflecting Wife's September 22 letter is on October 2. It reflects Wife's demand for "the $100K BI limits." The October 2 entries also reflect Wife's September 26 letter and noted that "IP-Mary is 'frustrated' and wants immediate attention." The note reflects that medical bills are enclosed.

4

**{12}**  This entry is in contrast with an entry to the same log noting receipt of an October 23 demand from the attorney for the driver of the other vehicle involved in the July 21 crash seeking "$100K BI limits within [ten] days from date of the letter" and enclosing "partial medical specials of $27,623.49." Stott responded to this demand within the time frame set by the letter and asked for a thirty-day extension. The other driver's claim was settled for policy limits on November 25.

**{13}**  On or about October 3, USAA sent Husband a notice of non-renewal of his auto insurance coverage through USAA. The notice informed Husband that the policy would not be renewed. On October 10, USAA informed Husband for the first time that it had become apparent that liability damages against him could exceed the USAA insurance policy coverage. USAA admitted during discovery that as of August 30, there was a substantial likelihood that Wife's claim would exceed policy limits.

**{14}**  From September 24—when Stott first spoke with Wife—until October 22, Stott asked for more information from Wife, including a medical authorization release form. Yet during discovery prior to trial, USAA admitted:

> No. 7: [Wife] experienced severe pain and suffering as a result of the injuries she sustained in the collision.
>
> . . . .
>
> No. 23:  There are no provisions in the USAA . . . policy requiring medical bills of any amount as a condition of settling bodily injury claims.
>
> No. 24:  There are no provisions in the USAA . . . policy at issue that require medical treatment records as a condition of settling bodily injury claims.
>
> No. 25:  There are no provisions in the USAA . . . policy at issue that require a medical authorization be obtained from the injured person as a condition of settling a bodily injury claim.
>
> . . . .
>
> No. 64:  USAA . . . claims examiner Taylor Stott called Covenant [H]ospital in Lubbock, Texas and learned with one phone call that [Wife] had over $300,000 in medical bills for her treatment at Covenant.
>
> No. 65:  USAA . . . claims examiner Taylor Stott called Covenant [H]ospital in Lubbock, Texas and was advised that USAA . . . could have all of [Wife's] medical bills from Covenant.

No. 66: [A] USAA . . . claims person . . . also contacted Covenant Hospital where [Wife] was hospitalized and with no medical authorization got medical bills mailed directly to her . . . from the hospital billing department.

No. 67: It took only one phone call from USAA . . . examiner Taylor Stott [to] Covenant [H]ospital in Lubbock, Texas to get [Wife's] medical bills mailed to USAA.

. . . .

No. 69: Covenant [H]ospital in Lubbock did not require a medical authorization from USAA . . . or [Wife] before providing [Wife's] medical bills to USAA.

. . . .

No. 73: USAA . . . did not need a medical authorization to obtain [Wife's] medical bills.

No. 74: [A] USAA . . . [claims person] got medical bills upon her request with no medical authorization from [Wife].

No. 75: USAA . . . claims examiner, Taylor Stott, obtained medical bills for [Wife] with no medical authorization from [Wife].

. . . .

No. 111: No employee of USAA . . . has requested or ever provided [Wife] with a proof of loss form.

**{15}** USAA's bodily injury adjuster sent a form letter to Wife on October 22, 2003, claiming "an amicable resolution/settlement had been reached" and offering to pay her $200,000 in settlement of her claim. The district court found that "USAA and Taylor Stott knew the factual representation that [Stott] and [Wife] had reached an amicable resolution/settlement was inaccurate as he had not spoken to [Wife] about settlement on October 22, 2003."

**{16}** Wife did not accept USAA's offer. Instead, five days later, she brought a personal injury proceeding against Husband and a bad faith claim against USAA in Santa Fe. Husband and USAA were separately represented in the case. The district court granted summary judgment in favor of Wife on the issue of liability, finding Husband to be 100% liable for the head-on collision. Rather than litigate the damages amount, the parties chose to mediate the issue. USAA agreed with the mediator that it would not contest an approved judgment amount, provided that it was between $1.5 and $3.2 million dollars. The parties

agreed to damages in the amount of $2.8 million dollars, and the Santa Fe district court entered judgment in favor of Wife in that amount against Husband.

**{17}** A few months before the Santa Fe tort action was completed, Husband brought this divorce action against Wife. At Wife's request, and due to Husband's early onset of Alzheimer's disease, the district court appointed Receiver to manage Husband's bad faith claim against USAA. Receiver filed a third-party complaint against USAA in this proceeding. Wife then filed her own bad faith claim against USAA, thus joining all litigation in what had started as a divorce action. The district court ruled against Wife on her independent claim and she did not appeal.

**{18}** The district court entered a finding that "USAA's October 22, 2003 letter and release to [Wife] was reasonable in amount, and was reasonable in terms but was not timely under the circumstances in response to [Wife's] settlement offer and injuries from the collision of July 21, 2003 with [Husband]." It also found that

> USAA failed to attempt in good faith to effectuate a *prompt*, fair[,] and equitable policy limits settlement . . . even though [Husband's] likely liability substantially in excess of policy limits became reasonably clear as a substantial likelihood by August 10, 2003, and no later than August 27, 2003 in violation of [Section] 59A-16-20(F).

Finally, the district court found that

> USAA failed to honestly and fairly balance its own interests and the interests of [Husband] by failing to timely pay its $100,000 policy limits to [Wife], by reducing its reserves based on an invalid policy provision which caused delay in payment[,] by failing to pay within a reasonable time after it knew there was a substantial likelihood of recovery in excess of [Husband's] policy limits and by its litigation tactics in providing an affidavit for [Husband] to sign stating he did not want to pursue claims against USAA when it knew through it[s] representatives that he was not competent to sign the affidavit. Moreover, its action in filing a lawsuit against [Husband] in Texas and defaulting him for attorney[] fees and costs when he could not have known of the consequences of his agreeing to sign the affidavit exhibits USAA's culpable conduct. USAA wantonly, recklessly, and in bad faith breached its contract with [Husband].

**{19}** As the finding of fact quoted above illustrates, the Texas litigation elucidated for the district court the nature of USAA's conduct with regard to Wife's claim and USAA's duties to Husband—its insured. We now turn to the events surrounding that episode.

**B.    The Texas Litigation**

7

**{20}** USAA does not contest any of the facts concerning the Texas litigation as found by the district court. Neither does it mention them in its briefing to this Court.

**{21}** On April 21, 2005, USAA sued Husband in federal court in Texas. In that suit, USAA sought a declaratory judgment establishing that Husband was liable for the excess judgment entered in the Santa Fe district court personal injury action. Sometime prior to USAA's filing of the action in Texas, Husband became aware that Wife wished to pursue a claim against USAA on her own behalf and that she also wanted him to pursue a bad faith claim against USAA. Husband objected to suing USAA. Husband contacted USAA, and a meeting was scheduled for April 11, 2005. Husband appeared at the meeting with his father. Husband's father went because he thought Husband was "unable to handle his own affairs." At the meeting, USAA was represented by the same attorneys who had represented USAA in the Santa Fe district court personal injury case. One of the attorneys represented USAA through the trial in this case.

**{22}** During the meeting, USAA's attorneys drafted an affidavit for Husband to sign noting his satisfaction with USAA's handling of the claim against him and expressing his desire that any claims against USAA be handled expeditiously and "finally dismissed with prejudice." The affidavit indicated that Husband was of sound mind. One of USAA's attorneys present at the meeting testified that Husband was "very articulate, that he could speak fluently and clearly, that he was very clear in his thoughts, and that he was very competent." Based on a broad survey of anecdotal evidence describing Husband's difficulties dealing with day-to-day matters and medical records from several doctors, the district court found that Husband "was not competent to comprehend legal documents[,]" . . . "was mentally impaired on April 11, 2005[,]" and "did not have contractual capacity." The district court further found that "Annmarie Simonson's testimony to the contrary is not credible."

**{23}** The district court found that "[p]rior to meeting with its impaired insured on April 11, 2005, . . . USAA had been on notice from at least six sources that [Husband] was mentally impaired from Alzheimer's [d]isease" and that the illness went back as far as 2003. USAA's sources of notice included adjuster Taylor Stott and Mark Klecan—the attorney who represented Husband in the Santa Fe district court personal injury suit. Ms. Simonson admitted that she "knew prior to that meeting that [Husband] had early onset dementia." Ms. Simonson also admitted that prior to the April 11 meeting, she had a copy of a motion seeking appointment of a receiver for Husband asserting that he had mental problems.

**{24}** Despite the multiple indications that Husband was having mental difficulties, USAA's attorneys met with Husband (and his father) alone and prepared documents for him to sign. USAA's attorneys did not ask Husband if he had a guardian or someone to help him given his illness. USAA's attorneys did not suggest to Husband that it would be a good idea to have a lawyer. USAA lawyers did not provide Husband or his father any details about the lawsuit USAA planned to file against him in Texas. USAA did not tell Husband or his father that USAA "would seek to have the [Texas] federal court make [Husband] pay

8

USAA's legal fees in that case." The personal injury judgment was not discussed at the meeting and USAA did not explain to Husband the consequences of signing the affidavit. During the meeting, USAA's attorneys did not discuss potential conflicts of interest or waiver of conflicts with Husband.

**{25}** The district court found that USAA's goal in filing the Texas litigation was to thwart the New Mexico bad faith case which it knew was about to be filed by Wife. Although USAA filed the Texas action against Husband in April 2005, USAA did not serve Husband until July 2005. Husband did not respond. The complaint sought attorney fees from husband "in addition to seeking judgment that [Husband] should solely remain responsible for excess judgment in favor of [Wife]." USAA took no further action in the Texas suit until January 2006, just after Receiver filed his suit. Then USAA filed a motion for default against Husband, including attorney fees and costs. USAA withdrew the motion for default after counsel was retained for Husband by Receiver.

**{26}** USAA through its corporate officer and counsel, Annmarie Simonson, testified that the conduct described above was in conformity with its practices and that it would do the same again, should the circumstance arise.

**{27}** The district court concluded as a matter of law—based on the facts outlined above—that "USAA wantonly and recklessly breached its contract with [Husband], and violated [Sections] 59A-16-20 and [-30]." The district court also concluded that "USAA's action with regard to [Husband] in the Texas litigation shows the culpable conduct of USAA regarding [Husband]." In the narrative portion of its Decision, the district court stated: "USAA knowingly, intentionally, and recklessly manipulated [Husband] to his detriment in its post judgment handling of this claim."

## II.   USAA's Cross-Appeal

**{28}** We begin with USAA's cross-appeal because if USAA is correct, there will be no bad faith judgment and Receiver's appeal will be moot. USAA argues that the district court "erred in determining that USAA acted in bad faith by not making a policy limits offer before [Wife's] time demand expired." USAA also argues that, in any event, Receiver could not pursue an insurance bad faith claim because Receiver was not a real party in interest.

### A.   Substantial Evidence Supports the District Court's Findings of Bad Faith

**{29}** The district court found that "USAA's October 22, 2003 letter and release to [Wife] was reasonable in amount, and was reasonable in terms but was not timely under the circumstances in response to [Wife's] settlement offer and injuries from the collision of July 21, 2003 with [Husband]."

**{30}** An insurer is subject to a common law and statutory duty of good faith. *See* § 59A-16-20(E); *Dairyland Ins. Co. v. Herman*, 1998-NMSC-005, ¶ 12, 124 N.M. 624, 954 P.2d 56. The district court ruled against USAA on both theories. Under the common law,

> [t]o be entitled to recover for bad-faith failure to settle, a plaintiff must show that the insurer's refusal to settle was based on a dishonest judgment. By "dishonest judgment," we mean that an insurer has failed to honestly and fairly balance its own interests and the interests of the insured. An insurer cannot be partial to its own interests, but rather must give the interests of its insured at least the same consideration or greater.

*Sloan v. State Farm Mut. Auto. Ins. Co.*, 2004-NMSC-004, ¶ 20, 135 N.M. 106, 85 P.3d 230. Under the statute, an insurer is prohibited from knowingly "not attempting in good faith to effectuate prompt, fair[,] and equitable settlements of an insured's claims in which liability has become reasonably clear." Section 59A-16-20(E).

**{31}** Whether, under the circumstances of this case, the offer to settle was timely is a question of fact. *See Leyba v. Whitley*, 120 N.M. 768, 778, 907 P.2d 172, 182 (1995) ("As always, what is reasonable is a question of fact to be determined in light of all the surrounding circumstances."); *cf. also Beaver v. Brumlow*, 2010-NMCA-033, ¶ 30, 148 N.M. 172, 231 P.3d 628 (observing that, when interpreting a contract term, "what is a reasonable time is a question of fact"); *Jaramillo v. Gonzales*, 2002-NMCA-072, ¶¶ 15-17, 132 N.M. 459, 50 P.3d 554 (noting that what constitutes a reasonable time within which to rescind a sale is a question of fact). Similarly, under the common law, the issue of whether USAA acted in bad faith is also a question of fact. *See Lujan v. Gonzales*, 84 N.M. 229, 237, 501 P.2d 673, 681 (Ct. App. 1972) (concluding that substantial evidence supported the district court's finding of bad faith); 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 206:13, at 206-26 (3d ed. 2005).

**{32}** "[W]e review the district court's findings of fact for substantial evidence." *Skeen v. Boyles*, 2009-NMCA-080, ¶ 17, 146 N.M. 627, 213 P.3d 531. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Salazar v. D.W.B.H., Inc.*, 2008-NMSC-054, ¶ 6, 144 N.M. 828, 192 P.3d 1205 (internal quotation marks and citation omitted). "[W]e will not reweigh the evidence nor substitute our judgment for that of the fact finder. The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177 (citations omitted).

**{33}** Substantial evidence supports the district court's finding that USAA's offer to settle was not prompt within the meaning of Section 59A-16-20(E). We begin by noting that nothing in the statute instructs us to consider only the delay between Wife's offer and USAA's eventual counter-offer. Instead, we look to the totality of the circumstances to determine whether USAA's offer was made promptly. *See* Russ & Segalla, *supra*, § 206:13.

10

USAA concedes that "[w]ithin a month of the accident, USAA knew that [Wife's] claim would exceed policy limits and that [Husband] was solely at fault for the accident." As discussed above, the district court found—and USAA does not dispute—that USAA actually knew this within four days. USAA made no attempt to settle the matter, and on September 22, 2003, Wife demanded payment of the full value of the policy. USAA ignored this offer and did not make its offer to settle until October 22, 2003. The district court found that USAA had all the information it needed by August 10—including information about medical bills exceeding $300,000—to make a settlement offer decision by the end of August. We certainly do not hold that three months is a per se unreasonable amount of time to delay before offering to settle. However, there was substantial evidence to support the district court's finding that, under the circumstances of this case, a three-month delay was not prompt. We therefore affirm the district court's ruling regarding the statutory bad faith claim.

**{34}** Regarding the common law bad faith claim, there is substantial evidence to support the court's finding that USAA failed to honestly and fairly balance its own interests and the interests of Husband. As explained above, the district court found that USAA was aware of its liability to Wife within four days of the accident. Nevertheless, USAA's first action was to investigate whether it could apply a policy provision it knew to be invalid to reduce the amount it would pay. Then, when USAA received a settlement offer from Wife, it ignored it. In fact, despite being aware of the time-sensitive nature of the settlement and in violation of USAA's procedures, the recipient of Wife's offer did not even forward it to the claims adjuster until after the offer had expired. These facts alone, viewed in the light most favorable to the judgment, are sufficient evidence to support the finding that USAA was acting primarily in its own interest. We need not consider USAA's egregious behavior in the Texas litigation to uphold the finding that USAA placed its own interests first.

**{35}** USAA makes two counter-arguments. First, it argues that Wife's discussions with adjuster Stott during the period in which her settlement offer was valid renders USAA's delay reasonable. Second, it asserts that the district court ignored other uncontroverted evidence and that when that evidence is taken into account, the district court's ultimate conclusion must be changed. We are not persuaded.

**{36}** With regard to the first theory, USAA contends that "[w]hen [the claims examiner] did receive the demand letter, he reasonably understood that the stated time limit was no longer operative." USAA suggests that this understanding was reasonable because Wife "never indicated in her conversation or subsequent communications with [the claims examiner] that her initial deadline remained effective." We doubt this argument was preserved. None of USAA's proposed findings of fact, conclusions or post-trial briefs make the argument as it is posed here. For the sake of completeness and because Wife does not assert lack of preservation, we choose to deal with the argument on its merits.

**{37}** The argument fails because it asks us to ignore both USAA's own fault in not delivering the letter promptly to its claims adjuster and the fact that the district court

11

apparently did not believe that the actions of the claims adjuster and USAA were reasonable. However, the ultimate problem with the argument is that it assumes our review should be only on the final month of the period during which USAA failed to settle and not on the entire time since the accident. Our review is not so limited, and, as we have discussed, USAA's behavior during the relevant period is sufficient to support the district court's findings of bad faith.

**{38}** USAA's second contention fails for a similar but distinct reason. USAA emphasizes that its actions were objectively reasonable given that all it did was deal with Wife's claim as it would any other claim, or, perhaps, even more expeditiously. Its investigation of the accident was normal, it asserts. Its request for information from Wife and Husband was normal and within its policies, it argues. It acted as promptly as it would with any serious claim, it contends.

**{39}** Even granting all the facts it asserts the trial court failed to consider, USAA's position is yet unconvincing. USAA's argument amounts to no more than an invitation to reweigh the evidence and view it in a light contrary to the district court's decision. That would be improper under our standard of review.

**{40}** In addition, we are not convinced that the district court ignored the evidence as USAA suggests. Rather, viewing the totality of the record, we believe the district court took all the evidence into account and reasonably rejected USAA's assertions that its actions were reasonable or based in normal business practice. As we have already noted, the facts available to USAA during the three-month period leading up to the offer to settle are enough to support the district court's decision that USAA unreasonably delayed tendering its policy limits and that it was not acting with due regard to the interests of its insured. It is clear that the district court rejected USAA's assertion that its requests in September and October for additional information were reasonable. When the district court's findings as to the Texas litigation are factored in, USAA's position becomes untenable.

**{41}** As USAA acknowledges, the district court used USAA's aggravated conduct in the Texas litigation to provide context for its interpretation of USAA's conduct throughout its interaction with Wife and Husband. It appears that the district court viewed USAA's action during the ninety days after the collision in light of its wanton and culpable conduct toward Husband in the Texas litigation. As the district court noted, "the manner in which [Husband] was dealt with by USAA compounded the earlier failure to timely settle." In that light, the district court's decision to reject USAA's innocent interpretation of events is amply supported and reasonable. In light of the aggravated circumstances of the Texas litigation, USAA's listing of assertedly innocent and reasonable acts provides vanishingly thin gruel upon which to urge that the district court erred in how it interpreted the facts. It is not our role to reweigh the evidence. In this case, there is nothing to weigh against the district court's decision.

**B.     Receiver Was Properly Appointed and is a Real Party in Interest**

12

**{42}** USAA's second attack on the bad faith judgment against it is that the judgment cannot stand because Receiver was not a real party in interest. The essence of this argument is that Wife was not authorized to ask for a receivership and the entire proceeding was therefore invalid. Specifically, USAA contends that Wife had no interest because the cause of action was Husband's separate property and not a marital asset. Receiver counters that Wife had an interest in the cause of action because it was community property and that even if Wife had no interest, the court had authority to act "to assure that all potential assets that might be of significance in the ultimate resolution of the ongoing divorce proceeding were gathered and protected."

**{43}** We begin by noting that USAA makes statements such as "Receiver was not the real party in interest on the bad faith claim. [Husband] was." Despite these statements, we do not understand USAA to argue that a receiver cannot be appointed to safeguard a cause of action. Instead, we read USAA to say that the specific receiver in this case was without authority because "[Wife] had no legitimate basis for invoking a receivership." In other words, we do not understand USAA to contest the district court's decision that appointment of a receiver was warranted, but rather whether Wife could even ask for the appointment of a receiver.

## 1. Background

**{44}** The first request for appointment of a receiver was filed by Wife on March 28, 2005. In that motion Wife relied on the "New Mexico Statutes on Dissolution of Marriage." Wife filed a supplemental motion, on April 14, this time also relying on New Mexico statutes on the appointment of receivers. Both motions noted that Husband "suffers from mental problems," was not meeting community obligations, and had refused to pursue the potential bad faith claim against USAA. The district court granted the Motion finding that the potential claim against USAA was a marital asset which should be pursued for the financial benefit of the marital estate and that failure to pursue it "may result in irreparable harm to the marital estate."

**{45}** Receiver filed his bad faith complaint in October 2005. USAA's answers included an affirmative defense asserting that Receiver was not the real party in interest and another asserting that the Receiver's appointment was "improper and invalid." Receiver filed a motion for summary judgment on these affirmative defenses. Receiver's motion listed thirty-three assertedly uncontroverted facts, including details of the collision, Wife's injuries and medical bills, and USAA's state of knowledge as to those details in the days following the collision. The motion also detailed the motion practice leading to Receiver's appointment and his hiring of counsel to pursue the claim, including the fact that no one—including Husband through his attorney—objected to appointment of Receiver.

**{46}** USAA's response to the motion for summary judgment did not dispute Receiver's facts, but did note that Husband had opposed appointment of Receiver, referring apparently to Husband's visit with USAA's attorneys on April 11. USAA's argument below was that

13

Husband's bad faith claim was his separate property and not a marital asset. Since Receiver "is only authorized to act to protect assets of the marital estate, . . . Receiver has no standing to pursue [Husband's] separate claims." USAA made no argument below that Wife did not have an interest in the bad faith claim sufficient to allow her to ask for appointment of Receiver.

**{47}** We note that Husband, through his attorney in the divorce action, supported Receiver's motion for summary judgment "in all aspects."

**{48}** The district court order granting Receiver's motion efficiently addressed all arguments made by the parties. We quote the most salient parts of the order:

2. USAA . . . did not dispute material facts 1 through 33 and thus they are admitted.

3. The Court has jurisdiction over all assets of the . . . marital estate including both community and separate property assets.

4. The Court has jurisdiction to characterize marital property as separate or community and make allocation of community and separate property.

5. The USAA . . . insurance policy was purchased with community funds of the . . . marital estate.

6. The claims against [Husband] and USAA . . . arose during the marriage.

7. [Husband] and [Wife] agree the bad faith claims are community marital assets and have consented to the appointment of the Receiver.

8. The bad faith related claims against USAA . . . are community property and marital assets of the . . . marital estate.

9. The appointment of . . . Receiver was proper.

10. The appointed Receiver is the real party in interest regarding these claims and summary judgment is proper on this issue.

**{49}** Understanding the procedural background of the appointment of Receiver and USAA's attacks on the right of the Receiver to pursue Husband's bad faith claim, we hesitate to undertake a substantive analysis of the issues, at least in the form it is argued here. We doubt, for example, that the theory argued to us was adequately preserved. Wife alludes to USAA's "new appellate argument" in her cross-appeal answer brief but does not argue

14

that we should not address the new argument. We take Wife's implied concession that the new argument is fair game at face value and address it, primarily because it is a legal argument not dependent on any further or different factual development than is in the record now.

**{50}** However, it is not clear that USAA has timely appealed the appointment of Receiver in the divorce action. *See* NMSA 1978, § 44-8-10 (1995) (implying that orders appointing receivers are final and appealable); *In re Estate of Harrington*, 2000-NMCA-058, ¶¶ 28-29, 129 N.M. 266, 5 P.3d 1070 (finding that an order appointing a receiver was a final order that must be appealed within thirty days of its entry). Indeed, because Receiver was appointed in the divorce case, it is not clear that USAA has standing to raise this issue at all. Nevertheless, we assume without deciding that we have jurisdiction to hear this argument. We make this assumption because (1) the parties have not argued this somewhat intricate issue, and (2) we would reach the same result had we concluded that USAA had no standing.

2.    **Receiver's Appointment Was Made Pursuant to the Receivership Act**

**{51}** A receiver is "[a] disinterested person appointed by a court . . . for the protection or collection of property that is the subject of diverse claims." Black's Law Dictionary 1383 (9th ed. 2009). The use of receivers in New Mexico was common long before the passage of the Receivership Act. *See, e.g.*, *Munis v. Herrera*, 1 N.M. (Gild) 362, 366 (1862) ("Courts of equity sometimes require parties in possession of property in dispute to give bonds that they will not commit waste or destroy the property; and at other times receivers are appointed to take charge of and manage the property in dispute during the pendency of the sui[.]"). "A court's authority to appoint a receiver can be derived from several sources. Court receivers are appointed by virtue of a court's equity jurisdiction or statutory authority. Receivers [also] may be provided for in a variety of contracts." *First Interstate Bank v. Heritage Square, Ltd.*, 113 N.M. 763, 766, 833 P.2d 240, 243 (1992). Additionally, the Legislature has enacted statutory provisions governing the creation and administration of receiverships. *See* Receivership Act, NMSA 1978, §§ 44-8-1 to -10 (1995, as amended through 1996) (the Act).

**{52}** Our first task is to determine which of these powers the district court exercised in appointing Receiver. The need to clarify this point arises because "[t]here is no requirement that the creation of a statutory remedy at law for a particular type of claim will automatically supplant an equitable remedy that addresses the same claim." *Sims v. Sims*, 1996-NMSC-078, ¶ 29, 122 N.M. 618, 930 P.2d 153. However, "only if a statute so provides with express language or necessary implication will New Mexico courts be deprived of their inherent equitable powers." *Id.* ¶ 30. Where law and equity overlap, equity is "supplemental" to law. *See id.* ¶ 29. The distinction is important in this case because if the court acted in equity, we would review its action for abuse of discretion. *Amkco, Ltd. v. Welborn*, 2001-NMSC-012, ¶ 8, 130 N.M. 155, 21 P.3d 24.

15

**{53}** We conclude that the court did not act in equity. The Act does not explicitly divest the courts of the ability to exercise their equitable powers to appoint receivers. Nor do we believe that such divestment is necessary by implication. For example, because the Act deals only with requests made by interested parties, it would appear that it does not preclude the district court's use of its equitable powers to appoint a receiver *sua sponte* in an appropriate case. But "equity will not act if there is a complete and adequate remedy at law." *Sims*, 1996-NMSC-078, ¶ 28 (quoting *S.P.C.S., Inc. v. Lockheed Shipbuilding & Constr. Co.*, 631 P.2d 999, 1001 (Wash. 1981)). Here, the Act provided the legal remedy Wife desired—the appointment of a receiver. Additionally, the purpose of the Act is "to provide a framework for the creation and administration of receiverships" such as was requested here. Section 44-8-2. Our conclusion is bolstered by changes Wife made in her amended motion requesting a receiver. The first motion requested the court to act under "the New Mexico Statutes on Dissolution of Marriage." The amended motion, however, requested action under "the New Mexico Statutes on Dissolution of Marriage and appointment of receivers," thereby making it clear that the request was made pursuant to the Act and not in equity. We therefore conclude that Receiver was appointed pursuant to the Act.

### 3. Wife had a Sufficient Interest to Request Appointment of Receiver

**{54}** We now turn our attention to the Act itself. A receiver may only be appointed upon application to the district court. *See* § 44-8-4. Application is made by an "applicant." Section 44-8-5. An applicant is defined as an "interested person," Section 44-8-3(A), which in turn is defined as "a person jointly owning or interested in a receivership estate." Section 44-8-3(C). USAA's argument therefore turns on whether Wife jointly owned or was interested in the bad faith cause of action.

**{55}** "The meaning of language used in a statute is a question of law that we review de novo." *Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61. "The principal command of statutory construction is that the court should determine and effectuate the intent of the [L]egislature using the plain language of the statute as the primary indicator of legislative intent." *State v. Ogden*, 118 N.M. 234, 242, 880 P.2d 845, 853 (1994) (citation omitted).

> Where, as here, a statute has only enlarged and united court powers previously existing at common law and in equity, and modified the proceedings under those powers, such statute is not, in the absence of express language or necessary implication, to be construed as supplanting, impairing, or restricting equity's normal function as an aid to complete justice. . . . Statutory enactments, even though they provide new procedures to enforce pre-existing rights at law and in equity, are to be read in harmony with the existing body of law, inclusive of existing equitable principles, unless an intention to change or repeal it is apparent.

16

*Sims*, 1996-NMSC-078, ¶ 29 (internal quotation marks and citation omitted).

**{56}**    With this in mind, we must determine the scope of the "interest" an applicant must have to request a receivership under the Act.  The Act itself does not provide a definition of "interest."  "Interest" can be defined as broadly as "[t]he object of any human desire; esp., advantage or profit of a financial nature."  Black's Law Dictionary, *supra*, at 885.  Slightly more narrowly, interest is "any aggregation of rights, privileges, powers, and immunities." *Id.*  Black's defines thirty-eight even narrower types of interest that fall under this definition. *Id.* at 885-86.  USAA frames the interest as an "interest" or a "legal interest"; however, it makes no attempt to define the term.  Instead, USAA asserts that no interest is possible because the cause of action is Husband's separate property.

**{57}**    We begin our analysis by considering the explicitly declared intent of the Act.  The Legislature stated that its intent in passing the Act was to "provide a framework for the creation and administration of receiverships."  Section 44-8-2.  Toward that end, the Act defines who may apply, how application is made, what the qualifications and responsibilities of a receiver include, how receiverships are terminated, and to some extent what must happen when an order appointing a receiver is appealed.  In our view, the Legislature has "enlarged and united court powers previously existing at common law and in equity, and modified the proceedings under those powers," and we therefore view the act in harmony with the equitable principles it has codified.  *Sims*, 1996-NMSC-078, ¶ 29 (internal quotation marks and citation omitted).

**{58}**    A court may exercise its discretion to use its equitable powers broadly to achieve justice.  *See Beaver*, 2010-NMCA-033, ¶ 29.  The Act embodies a legislative intent to preserve the discretionary nature of this formerly equitable power, allowing a receiver to be appointed "in actions where receivers have customarily been appointed by courts of law or equity" and "in any other case where, in the discretion of the district court, just cause exists and irreparable harm may result from failure to appoint a receiver."  Section 44-8-4(B).  To read "interest" narrowly would be contrary to the otherwise broad discretion we discern in the Act.  *See State v. Gurule*, 2011-NMCA-042, ¶ 12, 149 N.M. 599, 252 P.3d 823 ("[A]s a rule of statutory construction, we read all provisions of a statute and all statutes in pari materia together in order to ascertain the legislative intent.").

**{59}**    Because we interpret "interest" broadly, we need not decide whether the bad faith action was separate or community property to conclude that Wife's interest in it was sufficient.  Wife's request for the receivership came within the context of Husband's divorce action against her.  The district court's jurisdiction included both the community and separate property of Husband and Wife.  Recognizing jurisdiction in the district court over community and separate property in a dissolution proceeding makes common sense and is commonly accepted.  *See Trego v. Scott*, 1998-NMCA-080, ¶ 21, 125 N.M. 323, 961 P.2d 168.  The practical reasons for broad jurisdiction are evident in this case.  It cannot be contested that Wife's medical bills were community obligations.  Damages for medical bills and lost earnings are community claims.  Both Husband and Wife would have an "interest"

in a potential claim that might provide resources with which to pay them. *See Russell v. Russell*, 106 N.M. 133, 135, 740 P.2d 127, 130 (1987) (noting that medical expense payments are reimbursement for debts incurred by the community); *Douglas v. Douglas*, 101 N.M. 570, 571, 686 P.2d 260, 261 (1984) (noting that "damages for medical expenses and loss of earnings belong to the community").

**{60}** In addition, the district courts have the authority to take a party's separate assets into account for purposes of determining proper spousal support. *See* NMSA 1978, § 40-4-7(B)(1) (providing that a court "may allow either party such a reasonable portion of the spouse's property or such a reasonable sum of money to be paid by either spouse . . . as spousal support as under the circumstances of the case may seem just and proper"); *Ellsworth v. Ellsworth*, 97 N.M. 133, 134-35, 637 P.2d 564, 565-66 (1981) (noting that a spouse's separate property may be taken into account in deciding spousal support). As Wife notes, factors such as age, health, means of support, and potential future earnings of both spouses would be important considerations at dissolution given her injuries and Husband's mental condition.

**{61}** USAA's attempt to distinguish *Trego* and other cases on the ground that the bad faith claim here had no community component is unconvincing. USAA focuses on the fact that the *Trego* court was tasked with dividing the community portion of what had originally been separate property. However, USAA ignores the fact that this Court in *Trego* upheld the district court's jurisdiction over separate property in which the community had no interest. *See* 1998-NMCA-080, ¶ 22. USAA also attempts to distinguish *Trego* on the ground that the order granting receivership in this case was not part of a final marriage settlement. This distinction is irrelevant. We fail to see how—or why—a district court could not have the power to act to preserve a potential claim that might bring assets to the proceedings that could be used in arriving at a final settlement of the marital dispute.

**{62}** Despite our concerns over USAA's ability to raise the issue, we conclude that the appointment of Receiver was proper. The district court acted under the Act, which required that Wife, as applicant, possess an interest in the bad faith action. We ascribe a broad meaning to the term "interest" as used in the Act and hold that, at least in the context of the divorce proceeding here, and assuming without deciding that the bad faith action was Husband's separate property, Wife had an interest sufficient to justify her request for a receivership. As we have noted above, USAA has not argued that the court's decision to *grant* Wife's request was in error, and accordingly, we affirm the order appointing Receiver.

## III. Receiver's Appeal

**{63}** Having affirmed the district court's judgment that USAA acted in bad faith in failing to settle, we proceed to Receiver's argument that the district court erred by not allowing as damages the $2.7 million excess judgment caused by that bad faith. Receiver contends that (1) the failure to award damages for the excess judgment "is contrary to the fundamental policies underlying bad faith claims in the insurance context," (2) the agreement not to

18

execute the judgment against Husband does not preclude recovery of the excess judgment, and (3) the "vast majority of courts have recognized that an insurer remains legally obligated to the injured party where there is a covenant not to execute on the personal assets of the insured." In addition to responding to Receiver's arguments, USAA also argues that standard damages law precludes recovery of an excess judgment where there is a covenant not to execute against the insured.

**{64}** Our cases have made it clear that the measure of damages in a bad faith action is the amount of the excess judgment. If an insurer's decision not to settle is made in bad faith, the insurer "may be held liable for the judgment against [its insured] in excess of policy limits." *Lujan*, 84 N.M. at 236, 501 P.2d at 680; *see Dairyland*, 1998-NMSC-005, ¶ 15 ("Should an insurer, in violation of its duty of good faith, refuse to accept a reasonable settlement offer within policy limits, it will be liable for the entire judgment against the insured, including the amount in excess of policy limits.").

**{65}** And yet, there is room to argue, as USAA does, that *Lujan* and *Dairyland* do not express the minimum or mandatory damages, but only the amount recoverable under established damages principles in the typical case. Section 59A-16-30 allows successful plaintiffs "to recover actual damages." USAA contends that Husband cannot recover the excess judgment in this case because, since Wife agreed not to enforce the judgment against him personally, he has not been actually damaged by the judgment. We do not believe the Legislature intended Section 59A-16-30 to be read so narrowly.

**{66}** Although the parties have not used these exact terms, we understand their arguments to be asking us to decide whether damages in insurance bad faith actions should be determined by the "payment rule" or the "judgment rule." Although many states have chosen a side in this dispute, thus far New Mexico has not. In jurisdictions that apply the payment rule, "damages for bad faith failure to settle may be limited to the value of the insured's assets that are not exempt from legal process." Russ & Segalla, *supra*, § 9.03[2], at 9-5. Under this rule, insurers are not liable when there is a covenant not to execute, nor are they liable when their insureds are "bankrupt, insolvent, or otherwise judgment proof." *Glenn v. Fleming*, 799 P.2d 79, 92 (Kan. 1990) (emphasis omitted). It is essentially this rule that USAA urges upon us today.

**{67}** The majority of jurisdictions have chosen to follow the judgment rule. *See* William T. Barker & Ronald D. Kent, *New Appleman Insurance Bad Faith Litigation* § 2.03[6][f][i], at 2-85 (2d ed. 2011); 1 Allan D. Windt, *Insurance Claims and Disputes: Representation of Insurance Companies and Insureds* § 6:6 at 6-118 to -119 n.15 (5th ed. 2007) (collecting cases holding that an insurer is liable despite the existence of a covenant not to execute against its insured). The judgment rule does not require the insured to make payment as a precondition to the insurer's liability. *See Glenn*, 799 P.2d at 92. Underlying this rule is the notion that it is the judgment against the insured, not the amount of his personal exposure to it, that damages the insured. Thus, a bad faith insurer is liable regardless of whether its insured has paid, can pay, or must pay an excess judgment. *See id.*

19

**{68}** To determine the proper measure of damages we must interpret Section 59A-16-30. Interpretation of a statute is a question of law which we review de novo. *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69. "The guiding principle of statutory construction is that a statute should be interpreted in a manner consistent with legislative intent," which is determined by looking "not only to the language used in the statute, but also to the purpose to be achieved and the wrong to be remedied." *Id.*

> We attempt to determine legislative intent primarily from the legislation itself, and we will not depart from the plain wording of a statute, unless it is necessary to resolve an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or to deal with an irreconcilable conflict among statutory provisions. Further, we exercise caution in applying the plain meaning rule, for it must yield on occasion to an intention otherwise discerned in terms of equity, legislative history, or other sources.

*Nat'l Union of Hosp. Emps. v. Bd. of Regents*, 2010-NMCA-102, ¶ 23, 149 N.M. 107, 245 P.3d 51 (alteration, internal quotation marks and citations omitted).

**{69}** The plain language of Section 59A-16-30, which allows recovery of "actual damages," seems on its face to favor USAA's position. However, such an application would lead to absurd results. A narrow reading would undermine the common and accepted practice of assigning the bad faith cause of action to a third party in exchange for a release of liability: upon the release of liability, there would be no actual damages. For example, in *King v. Allstate Insurance Company*, a third party entered into a settlement with an insured which released the third party's claims against the insured but reserved the bad faith claims against the insurer. 2007-NMCA-044, ¶ 5, 141 N.M. 612, 159 P.3d 261. The court observed that "nothing in the dealings between the parties prejudiced [the third party's] right to file his claim." *Id.* ¶ 19. Under the payment rule, however, the release would have prejudiced the third party's right to file a claim, and the case would have been decided on different grounds.

**{70}** Similarly, an insurer's liability for its bad faith would be limited by the financial status of its insured—a judgment-proof insured, or an insured whose judgment was discharged in bankruptcy, would insulate an insurer from the consequences of its bad faith. In light of the repeated statements from our Supreme Court that mandatory automobile insurance was enacted to protect all New Mexicans, *e.g.*, *Allstate Ins. Co. v. Jensen*, 109 N.M. 584, 587, 788 P.2d 340, 343 (1990), we are certain that our legislature did not intend that protection to depend on the financial circumstances of the insured in each case. Because the plain meaning here yields results that are absurd, we turn to our cases describing the policy behind Section 59A-16-30 to discern its meaning.

**{71}** Well-established policy considerations support the use of the excess judgment as a minimum measure of damages. Our Supreme Court has held that in creating a statutory cause of action for insurance bad faith, "the Legislature had a remedial purpose in mind: to

20

encourage ethical claims practices within the insurance industry." *Hovet*, 2004-NMSC-010, ¶ 14. An application of general damage principles to preclude recovery of an excess judgment directly undermines that purpose by multiplying the avenues, both ethical and unethical, by which an insurer might avoid the consequences of its bad faith actions. The goal of ensuring ethical claims practices is better achieved by setting the amount of the excess judgment as a floor for damages when an insurer is found to have acted in bad faith.

**{72}** Additionally, application of the restrictive approach USAA suggests would discourage settlements. "The rule imposing liability on an insurer for failure to effect a reasonable settlement within its policy limits serves an important public policy of encouraging settlement of legal controversies." Russ & Segalla, *supra*, § 206:27 at 206-43; *see Hovet v. Lujan*, 2003-NMCA-061, ¶ 12, 133 N.M. 611, 66 P.3d 980, *aff'd* 2004-NMSC-010. But, under the rule USAA proposes, settlements between insureds and injured parties would effectively eliminate what is often the main reason motivating settlement: the ability to obtain the excess judgment from an insurer who has acted in bad faith.

**{73}** The preceding discussion resolves the issue of available damages under Section 59A-16-30. It bears emphasis that the policies fostered by our ruling apply with equal force to common law bad faith claims with the same result and measure of damages.

**{74}** Finally, we reject USAA's argument that the district court correctly interpreted *Sanchez ex rel. Sanchez v. Kirby*, 2002-NMCA-017, ¶ 15, 131 N.M. 565, 40 P.3d 1009, as precluding an insured from recovering an excess judgment against him when a covenant not to execute judgment against that insured exists. In *Sanchez*, after an insured was found liable in a personal injury suit, he assigned his rights and claims against his insurer to the judgment creditor in exchange for a covenant not to execute the remainder of the excess judgment against him. *Id.* ¶ 6. The insurer appealed *the personal injury judgment*, ostensibly on behalf of its insured. At issue was whether the insurer could force its insured to appeal a personal injury judgment when the judgment creditor has released all claims against him and the appeal could potentially expose the insured to greater risk. *See id.* ¶¶ 8-9. Characterizing the insurer's efforts as having "a primary purpose of reversing the judgment in order to lessen the impact of or to moot a bad faith action," *id.* ¶ 12, and noting that it was "apparent [that the insured was] not interested in having [his insurer] protect his rights," *id.* ¶ 16, we dismissed the appeal as moot. *Id.* The instant case, unlike *Sanchez*, does not involve an insurer forcing an unwanted and potentially harmful appeal from a personal injury judgment upon an insured who is no longer liable. It involves the insured's separate bad faith proceeding against the insurer. Additionally, unlike *Sanchez*, the judgment creditor in this case has not released Husband from liability—she has only agreed not to seek satisfaction of the judgment against Husband personally. This is not a case where the covenant suggests that the appeal should be moot. It is a case where the parties dispute the effect of the covenant on the damages awarded. *Sanchez* provides no guidance on this issue.

## III.    CONCLUSION

21

**{75}** For the foregoing reasons, we reverse the judgment of the district court with regard to available damages in the bad faith claims. We affirm the district court in all other regards and remand for further proceedings consistent with this Opinion.

**{76}** **IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Judge**

_____
**J. MILES HANISEE, Judge**

**Topic Index for _Dydek v. Dydek_, Docket Nos. 30,775/30,80**

**APPEAL AND ERROR**
Standard of Review
Substantial or Sufficient Evidence

**CIVIL PROCEDURE**
Real Party in Interest

**DOMESTIC RELATIONS**
Dissolution of Marriage

**INSURANCE**
Bad Faith
Duty to Defend
Motor Vehicle Insurance
Settlement

**PROPERTY**
Receiver

**REMEDIES**
Excessive Damages
Punitive Damages